DAVIS, BY GUARDIAN, *vs.* TUSCUMBIA, COURTLAND AND DE-
CATUR RAIL ROAD COMPANY.*

1. This Court, it seems, in proper cases, has authority to issue
   writs of injunction.
2. The power granted to the Tuscumbia, Courtland and Deca-
   tur Rail Road Company, to condemn lands, by the charter†
   and the amendment thereto,‡ was not in violation of the con-
   stitution.§

A bill, praying an injunction, was submitted to
this Court, by Garley, guardian of Davis, praying
that the Tuscumbia, Courtland and Decatur Rail
Road Company might be restrained from trespasses
upon the lands of the complainant's ward.

The bill alleged, that by statute of January, 1832,
a charter was given to this corporation, whereby
certain privileges were insured to it; among which
was the power of condemning the lands of private
persons, for the uses and purposes of a rail road.—
By this charter, it was enacted, that in case the own-
er of the lands, required for the use of the Compa-
ny, could not agree with them, as to compensation;
or, if the owner should be non-resident, or *non-com-
pos mentis*, then the President and Directors were
authorised, on application to a justice, to procure the

---

* See Aldridge *vs.* This Company, 2 Stewart & Porter, 199.
† Acts of 1831-2, page 67.
‡ Acts of 1832-3, page 15.
§ The case of Aldridge *vs.* The Tuscumbia, Courtland and Decatur Rail
Road Company, (2 Stewart & Porter, 199,) having declared the principle in-
volved in this case fully; those disposed to examine the question further, are
referred to that case. This cause has been reported, not only because it is a
new adjudication of the principle, determined in Aldridge's case; but because
it also contains an able argument, in which all the reason and anthority against
the opinion of the Court, is to be found collected. by the counsel who argued
it.                                                             REPORTER.

issuance of a warrant, directed to the sheriff of the County, requiring him to summon a jury of seven disinterested free-holders, a majority of whom were empowered to assess the damage—subject to the right of appeal to the Circuit Court, and a trial *de novo*. The land so condemned, was, by said charter, to vest in the Company for fifty years, upon the payment of the amount assessed as aforesaid, to the owner.

The bill, after reciting the provisions of the charter generally, upon this subject, alleged, that part of the lands, belonging to the father of the complainant's ward, to wit, John Davis, having, in his lifetime, become necessary for the use of the company; and the said Davis and the President and Directors not agreeing as to the value, a warrant was issued by a justice, under the aforesaid clause in the charter, and the land condemned, and a particular value assessed upon it. That the said Davis being dissatisfied therewith, took an appeal to the Circuit Court of Franklin, which appeal at the time of the filing of said bill, was still pending and undetermined: and that after the appeal was taken, said Davis died. That after the death of the said Davis partition was made of the said lands, and after a portion thereof had been allotted to the complainant's ward, certain agents of the said Company had entered upon the land owned by the said ward of the complainant, and dug up and removed the same contrary to law, and the consent of the said complainant. By the death of said Davis, as alleged, during the pendency of said appeal; and by the subsequent partition of the aforesaid land, the said appeal could not be con-

tinued for the want of proper parties. The bill, therefore, prayed the usual process, and asked from this Court, such relief as was meet and proper.

*Anderson*, for complainant.—The bill sets forth that John Davis, in his life-time, was the owner of a quarter section of land : that the Rail Road Company required a portion of it for the site of their road : that, not agreeing as to compensation, an assessment of damages was made, agreeably to the mode pointed out by the charter.—That Davis took an appeal therefrom, which is still pending. That Davis departed this life, and the quarter section of land, on which the damage was so assessed, became divided into two parts: that a moiety of it is now the several property of Major Davis, who, being of unsound mind, was placed under the guardianship of the complainant.

The bill further states, that in May, certain persons, agents of the Rail Road Company, entered upon the premises, and that they justify their acts by authority derived from the Company. It is further stated, that the Company, previous to the trespass complained of, tendered to the complainant a portion of the amount of damage assessed, equal to the proportion in quantity of land, that had become the several property of Major Davis. It further states, that the acts of trespass were with a view to lay out a road over the premises, thereby destroying the inheritance.

To entitle the complainant to the prayer of his bill, it is necessary to establish the affirmative of three propositions—

1st. That the land, at the time of the trespass was the property of the complainant.

2d. That an act of trespass was committed, by the defendants.

3d. That such acts of trespass tend, in their consequences, to irreparable damage.

These three propositions cover the whole ground; and must decide the case.

The Court will observe, that the second proposition consists in the affirmation of a fact, and is therefore established by proof of the truth of the fact, to wit, that acts of trespass have been committed by the defendants. The bill is sufficient proof of the facts contained in it, for the purposes of an injunction. This is clearly shown by the practice of Courts of Chancery. No other proof is demanded than the oath of the complainant. The bill states, " that the defendants entered upon the premises and trode down and destroyed the grass and grain, and dug up the soil with the intent of applying the land as the foundation of a rail road, thereby destroying the inheritance." As this must be taken to be true, for the purpose of an injunction, the complainant has made out the affirmative of the first proposition, viz: that acts of trespass, tending to destroy the inheritance, have been committed by the defendants.

I shall now endeavor to establish the first proposition, to wit : " that the land was, at the time of the trespass, the property of the complainant"—that Davis was the owner previously to the assessment of damages under the charter of the company—that on his death, that portion of it on which the trespass was committed, became the several property of

Major Davis, and that the complainant is guardian of Major Davis, are facts established by the bill, and sufficiently established. The complainant's title, previously to that time, is clearly made out. Whether, therefore, he continued to be owner on the day of the trespass, will depend on the legal effect to be given to *the acts* of the company.

*These acts* are—

1st. An assessment of damage in the mode pointed out in the charter, from which Davis, in his life-time, appealed; which appeal is now pending.

2d. A tender to the complainant of a portion of the assessed damage, equal to the portion of the quarter section that had become the several property of the complainant's ward.

If *these acts* vested the property in the company, then the first proposition has not been made out; on the other hand, if these acts did not vest the property in the company, then, I conceive, the first proposition has been made out.

If the property did vest, that effect could be produced only by the law. The act of valuation, without the law, could not vest an interest in the company. We must then examine the law. The law of their charter says, the company may assess the value of lands required for the rail road, by a jury of seven disinterested free-holders, convened at the instance of the company, by a writ from a justice. A majority of them may act. It says, also, that an appeal may be taken, and such appeal shall be tried by a jury, as in other cases. And it further says, that an appeal shall have the effect of suspending all rights under the assessment; but when the ap-

peal is tried by a jury, then the company may tender the amount, and such tender being made, the company shall become entitled to the property.

I have stated the substance of the charter. I do not know that any other meaning than the above, has been given to it, by any person, at any time. If this then were the only law, the case would be a clear one. The assessment wolud have vested no interest in the company, because an appeal was taken, and that, had the act been silent, would have prevented any rights arising under the assessment. (See act of incorporation, Laws of Alabama, session of 1831 '2.)

The act of 1832, '3, which is supplemental to the charter, reads thus, " when any persons owning lands required for the use of the rail road, shall refuse to receive the damages assessed against the company, *by a jury summoned for that purpose*, the company, on tendering the money, &c., shall not be delayed."

Two questions arise on this act—

1st. What is meant by the words " a jury summoned for that purpose ?"

2d. If its meaning should be found to be a *board of seven disinterested free-holders,* convened in the mode pointed out in the charter, whether the act, giving it such meaning, would be a constitutional act?

The latter question shall be first considered. Assuming then the meaning of the act to be as stated above, I hold it to be a violation of that principle of our Constitution, declaring that the right to trial by jury, shall remain inviolate. Also that principle declaring, that no person shall be deprived of life, liberty, or property, but by due course of law. It also

violates the 5th article of the amendments to the Constitution of the United States, which declares, that private property shall not be taken for public use, without just compensation.

The complainant invokes the aid of these sacred principles, for the protection of his property. He appeals to this Court, and with confidence, for an assertion of them. Elsewhere they may be lost sight of, but here, he is convinced, their importance will be felt; and now, and at all times, while our government remains a government of laws, these principles, the brightest and the best secured by the revolution, will be administered with strictness, proportioned to their value.

This act, giving it the meaning above stated, and taking it in connection with the act of charter, provides, in effect, that a person may be deprived of his property by a majority of seven persons, convened at the instance of the company, and governed, in their deliberations, by none of the rules of the common law.

Now I contend, that such a body of men are not a Court, nor are they a jury. They do not constitute a Court, because the Constitution of the State declares, that all judicial power shall be vested in a Supreme Court, Circuit Courts, and such Inferior Courts, to consist of *not more than five members*, as the Legislature may establish.

They do not constitute a jury, because—

1st. A jury cannot act without the concurrence of a Court, of which they form a part, and independantly of which they can do no legal act.

If there be no Court, who is to judge of the qua-

lification of the jurors? The writ by which they are summoned, requires, at common law, that the jurors should be "good and lawful men of the vicinage, freeholders, not related to either of the parties," and they were to be chosen from the *pares curtis.* The writ was returnable before the Court. Until such return was made, and the Court had determined that they possessed the qualifications contained in the writ, they were not jurors. Now the charter requires, that the seven assessors shall be freeholders, and that they shall be disinterested.— No mode is pointed out by which these qualifications are to be ascertained. If they were to judge of their own qualifications, then would they judge in their own case. But, as I have said, the right to judge is the right of a Court, and as there is no Court before whom they are to appear, there is no mode of ascertaining their qualifications, and until these qualifications are ascertained, judicially, to exist, they are not jurors.

By not providing a mode to test the qualification of the seven assessors, the parties are deprived of a right, which is essential to the trial by jury, to wit, the right of choice. It is a legal presumption, that the jurors are chosen by the parties. The right of choosing necessarily implies the right of rejecting. As, therefore, the right of challenge can not be enforced, even for cause, these seven assessors can not be a jury. The right of challenge, for cause, and peremptorily, were considered as sufficient to secure to the parties, jurors of *their own choice.* By the common law, in capital cases, the right of peremptory challenge was given to the amount of three full

juries. Four juries were supposed to constitute the total *pares* out of whom choice was to be made.— Therefore, it appears that the right to choose was given to the furthest extent consistant with the having of a trial. If the prisoner challenged more than the law allowed, he was condemned as declining the trial by law appointed, but the same consequences did not follow therefrom, as on conviction by verdict. There was no attainder. The party suffered for contumacy; but as there could be no trial but by a jury of his own choosing, and he had declined choosing one, the prisoner was not considered as having been condemned by jury or *verdict of equals*. In cases not capital, and civil cases, the right of challenge, for cause, is an essential constituent of the trial by jury, because it is the mode pointed out of ascertaining the qualification of the jurors, whether they agree with the requirements of the writ of summons. In short, it is the mode of giving the parties a jury of their own choice.

2d. The board of seven are not a jury, because a jury must consist of twelve persons; and a less number cannot render a verdict. This is obvious from the words of the *venire facias*, which requires twelve to be summoned. *Bacon, in his Abridgment, title Juries, p.* 234, *old ed*, says, that the grand jury must consist of twelve, at least—the petit jury of twelve, *and can be neither more nor less."* Inquests may consist of a less number, but inquests are not verdicts. Attaint will not lie for false inquest, (Bacon's Ab. 278,) but for false verdict attaint will lie—(Cro. Car. 414.)

Trial by due course of law, means, says Lord *Coke,* " by *verdict* of equals." An inquest, there-

fore, to which a less number than twelve were competent, could deprive no person of their life, liberty, or property.

3d. The Board of seven are not a jury; because a majority are empowered to make a final determination, whereas a jury must be unanimous. If there be any one feature that characterises a jury, from all other deliberative assemblies, known to government, it is this, that they must be unanimous.— Hence the right to poll the jury — hence, also, if it be made to appear that the jurors made up their verdict, not by deliberation, but by some substituted in the place of attaint, would be granted. arbitrary rule agreed upon between them, they were liable to attaint—and, at this day, new trial, which is

It is surely unnecessary to pursue this part of the case further : it would be tedious to point out every instance of disagreement between this board of seven, and a common law jury. Their mode of proceeding and their numbers, would be alone sufficient to show a discrepancy. I might advert to the fact that they do not proceed by testimony; that it is not made, by the charter, imperative, to allow the defendant a right to be present, or to produce witnesses— that there is no mode to compel the attendance of witnesses; and, finally, the power of the Board is not made to extend to all questions that may arise, and which must be determined, before a person can be deprived of his property for public use. I shall point out but one. Suppose the land claimed was not for the use of the rail road, but that was made a pretence for seizing it. The Board can not try that fact; yet, by the construction that is sought to be

given to the act of 1832, the judgment of this incompetent board is declared to divest a citizen of his freehold.

Now, permit me to ask whether the legislature. consistently with that clause in the constitution, that guards the right of a trial by jury, and a trial by due course of law, could give to a board thus constituted, the power to deprive a citizen of his property? And, in answering this question, I beg the Court to recollect, that if it be answered in the affirmative, then might the legislature deprive a citizen of his life or his liberty, by the judgment of a like board—for there is no greater or other security for the one than the other.

The framers of the constitution, by declaring that " the right to trial by jury should remain inviolate," meant some right which was, at that time, certain ; and that it should "remain," as it then was. This is evident, from the words used, to wit: " the right " shall " remain." If the right intended to be guarded was certain, where were the evidences of what this right was ? I answer, the evidences were to be found in the common law, which, at the time of the adoption of the constitution, was the law of this State. It was the trial by jury, as known and made certain by this common law, which they intended to protect, by declaring that it should "remain" as it then was. Against whom did they intend to protect it?— Surely it must have been against some power that, otherwise would have had the right to infringe it.— And this was the law-making power. It was our legislature that the constitution intended to control ; and this control they have, with a wise foresight,

placed in the hands of this Court, and with the solemn injunction to administer it, that is contained in that oath, by which they bind themselves to administer the laws, the supreme of which is this very constitution.

To contend, that the legislature, although restrained forom impairing the right, have, nevertheless, power to define what shall constitute the right, is a falacy too much on the surface to need exposing.— Their power to define would be inconsistent with that control which the constitution confessedly has imposed, by declaring that the right shall remain inviolate. If they have a right to define, they have a right to alter, and if they have a right to alter, then is the right not made certain by the constitution.—It is not placed, as it was intended it should be, beyond the influence of party strife, and party feeling, that so often overturns right. No oppression is more grievous to be borne than oppressions by sanctions of law. The history of all governments is full of instruction on this point. And the framers of our constitution, taught by that instruction, wisely threw around the invaluable right of trial by jury, the high protection that is given to all our constitutional rights, which can not be altered, but by the people, assembled in convention.

It may be asked, have not the legislature a right to legislate with regard to juries? Can they not enlarge or diminish the right of challenge?—Can they not make a law to convene the jurors from an adjacent county to that in which the crime is committed, or in which the parties reside?

It is not, I conceive, important to discuss the ex-

tent to which the legislature may go. It shall suf-
fice to remark, that there are things essential to a ju-
ry and to a trial by jury—there are other things, to
use the language of logicians, accidental to it—that
may or may not exist, without impairing its essential
qualities. Over the latter, legislatures have control,
but not over the former. And I shall dismiss this
branch of the subject, by observing that I think I
have sufficiently established, that a law, declaring
that a majority of seven men, convened agreeably
to the mode pointed out in this charter, and proceed-
ing as thereby directed, shall be constituted a com-
mon law jury, and that their verdicts shall deprive
the citizen of his life, liberty or property, is a law,
impairing the right to trial by jury, and the ascer-
tainment of right by "due course of law."

Having thus established, that the construction of
the law of 1832, making the judgment of a board of
a majority of seven, equal to a verdict of a jury at
common law, is unconstitutional, I proceed to show,
that the legislature did not intend to give it that
force. A Court will so construe a law as to give it
some meaning. If there be two constructions equal-
ly apparent by the letter, one of which would de-
feat the operation of the act, the other would give
it legal vigor, the latter will be adopted. Lord *Coke*
says, that an act of parliament, against reason, is
void. This is an essential, though not a literal truth.
For, Courts in England, although not assuming a
right to go contrary to an act of parliament, have,
nevertheless, exercised their right of construction so
liberally as to decide contrary, to the letter of an act

4 s & p. 55

of parliament. In this country, the same latitude of construction has often been resorted to, in order to save the act construed, from the influence of the constitution, which, under a liberal construction, would have rendered them void.

The act in question says, that when any person, owning lands, required for the rail road, shall refuse to receive the damages assessed against the company, by a "*jury summoned for that purpose*, the Company, on tendering," &c. shall have the land. Now, if, by the terms, "a jury summoned for that purpose," be meant the board of seven persons mentioned in the charter, then, as I have already shewn, the act is unconstitutional, as the verdict of such a board couldver, not give the company a right to the land. If however, it be construed to mean what its terms imply, a jury of twelve persons is known to the common law, then the act is constitutional. I will merely observe that the latter construction is more consonant with the letter, than the first. It is for the Court to say which shall be given.

The constitution of the United States provides that individual property shall not be taken for public use, without just compensation.

I beg leave to observe, that the meaning of this clause is, that *an equivalent* shall be given either before or *at the time* of the taking of the *property for public use.* As the thing given and the thing received must be equal, it is evident there must be some power, by which this equality is to be determined.— The public, who require the use of the property, is one party—the owner is the other party. It is plain, that neither the one or the other, separately, has

the right of determining this equality or compensation, on the principle, that a party can not be a judge in his own cause. It may be determined by agreement between them, for the parties then make the law. But if they can not agree, how is it to be done? I answer, in the language of Judge *Patterson*, it must be by a judicial act and a jury—a common law jury must be resorted to.

But I have said that compensation must be made, *at the time the land is taken.* This must necessarily be so, or it is not compensation. There is as great a difference between compensation and a right to compensation, as there is between payment and a right to payment.

If it be said that the public necessity may be so urgent as to admit of no delay—to this I reply, that such a necessity would make a law unto itself. It would form an exception, which is perfectly consistent with the general rule.

In the case of *Vanhorne's Lessee* vs. *Dorrance*, 2 Dal. 304, a board of property established by a law of Pennsylvania, to ascertain the value and grant equivalents to occupants of lands held by title from the State which proved to be defective; Judge *Patterson* held the board thus constituted, not a constitutional tribunal for that purpose. At page 314, he says, "If the business," (that is, the value or compensation,) "can not be settled by agreement, then it should be ascertained by persons mutually chosen, or by the intervention of the judiciary, of which a jury is a component part." In the first case we approximate nearly to a contract, because the will of the party whose property is to be affected, co-operates with

the legislature. In the other case, there is the intervention of a Court of law; or, in other words, a jury passes between the public and the individual, who after hearing proofs and allegations, will, by their verdict, fix the value of property, or the sum to be paid for it."

This is sound doctrine. It can never be overturned, while law gives protection to right. It would be an insult to your honors' understanding, to multiply cases in support of a doctrine that needs only to be stated to be assented to.

If, then, the board of seven are not a jury, and it requires the action of a jury to divest the complainant of his property, I have successfully made out the affirmative of the first proposition.

The second proposition having been the first considered, it remains only to establish the third, that the acts of trespass committed, were such as tended to irreparable injury?

This is a question of law. Lord *Thurlow* probably was the first to grant an injunction to restrain a trespass, simply on the ground of trespass. Since his day, however, it has been repeatedly done. This jurisdiction is favorably regarded by Courts of Chancery.

I concede that the acts of trespass must be such as tend to irreparable injury. By this, however, is not to be understood such damage that compensation can not satisfy, but of such as the law presumes may be greater than any equivalent.

I lay down this as a principle supported by authority—that wherever acts of trespass tend to destroy the inheritance — wherever it is destructive of the

property as it has been held and enjoyed, an injunction will lie. There is an obvious distinction between a trespass, that has no other object than treading down and destroying the herbage, and one that tends to destroy the inheritance, by making a permanent appropriation of that which constitutes a portion of the inheritance.

Upon this distinction was the case of *Mitchell* vs. *Dors* (6 Ves. 147,) founded, and on the authority of Fleming's case, who, as I observed, was the first to establish the doctrine. In that case the defendant was restrained from digging coal, because the coal was part of the inheritance. Here, the Court will perceive, that compensation might have been made, for nothing was more easy than to establish the damage; but an injunction was allowed, because it tended to destroy the estate, in the mode in which it had been enjoyed. It was taking from it that which constituted a part of the inheritance.

On the principle, that the accessary follows the principal, it has been held, that the grant of a mine takes with it the land that covers the mine. The Chancellor, therefore, considered the mine as the principal thing; and the injunction was granted, because the defendant was carrying away that which constituted a part of the inheritance.—7 Ves. 307.

In the present case, as in the above, the mischief, to use an expression of Chancellor *Kent*, " reaches the very substance and value of the estate, and goes to the destruction of it in the mode in which it has been enjoyed."

The case of *Shaw* vs. *Henderson*, 2 Dow. 519, is

a case so much in point, that if there be any difference, I confess I do not perceive it.

The Aberdeen Canal Navigation Company, deviated from the line marked out by their charter, and an injunction was granted. Now what was the principle of this decision? Not that the lands they took were of any peculiar value, but that they were taken against right, and permanently appropriated, to the destruction of the inheritance. In this case, says Chancellor *Kent*, (7 Johns. Ch. R. 335,) the company were making a permanent appropriation of the land and destroying the inheritance;- and upon the acknowledged principle in all the cases, it was necessary to restrain them.

In the case last referred to, in 7 Johns. Ch. R., the Chancellor dissolved the injunction granted by the Vice-Chancellor; but on a ground that does not impeach the validity of the distinction I have taken.— In that case the Canal Company had taken from " a barren ledge of rock, absolutely worthless for any other purpose than that to which the defendants applied it, a quantity of stone, for the use of the Canal. The stone thus taken was not, as in the case of a mine, the principal thing constituting the inheritance. Nor did the company seek to make a permanent appropriation of the land which constituted the inheritance. Therefore it differed from the case that is now presented to the Court.

I now beg leave to say, that in my opinion, I have made out the affirmative of the three propositions laid down in the outset of my argument.

1st. That the property trespassed on was the property of the complainant.

DAVIS vs. TUSCUMBIA &c. RAIL ROAD COMPANY.

2d.  That acts of trespass were committed.

3d.  That these acts of trespass were such as tended, in their consequences, to irreparable injury.

And now the complainant asks, why he is not entitled to his injunction.  His property has been trespassed on, in violation of the fundamental laws of the land, in which he lives.  His inheritance has been destroyed by the lawless acts of a set of men seeking their own gain, regardless of whom they may oppress.  He demands to know, if the laws are adequate to his protection, or whether he must yield up the gains of an honest industry, to enrich the cupidity of the undeserving.  Whether the laws under which he lives, and which secures to him a trial by jury, do in fact mean, a majority of seven men convened at the pleasure of his oppressors—and convened with a well considered view to condemnation, and not to justice.  Whether his property is to be taken without compensation, regardless of the high sanction of the Constitution of the United States, which is the language of the whole people of these confederated Republics, guaranteeing to him, that his property shall remain inviolate.

He can not believe, and the counsel who represents him does not believe, that any consideration of consequences that may flow from the exercise of a power, right and proper to be exercised, can have any influence with this Court.  But if considerations of that kind were to have weight, this Court is too well able to calculate the immediate consequence of granting, and the remote consequence of rejecting this application, not to perceive, that every motive of patriotism as well as justice, speak loudly for the

complainant. At most, if granted, a work supposed by some to be of public advantage, will be delayed until the company do justice to the complainant.— But the least that is to be apprehended from a refusal, is the destruction of all constitutional protection to property; and the assertion of a principle of rapacity, that brings insecurity to all our possessions; and every thing else that the citizen holds dear.— Thereafter we may possess, but we cannot enjoy.— Enjoyment is the creature of security, and that being swept away, there remains to us the consolation of the slave—we have that only which others are kind enough not to take from us.

LIPSCOMB, C. J.—This is an application made to us for an injunction, to prevent trespass, &c., on the real estate of complainant's ward.

We have no doubt that this Court has authority to issue writs of injunction, when a case, calling for the exercise of such authority, is presented by the bill.

The principal grounds relied on in support of this application, were fully considered by this Court, in the case of *Alldridge* vs. *the same Corporation.* We were then of the opinion, that the corporation was constitutionally invested with the authority it had exercised; we are of the same opinion still. And we believe, that the amendment to the charter, enacted by the Legislature since our decision, is also compatible with the Constitution. But however that may be, a majority of the Court are of the opinion, that there is no equity in this bill, and that the application must therefore be rejected.